# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| JONATHAN E. MITCHELL, | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil No. 2:13-cv-00132-NT<br>) |
| ROBERT MILLER, | )<br>) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jonathan E. Mitchell alleges that his rights under the Fourth Amendment and the common law of Maine were violated when he was shot and wounded by Defendant Robert Miller, a Portland, Maine police officer, after a high speed car chase. Before the Court is the Defendant's motion for summary judgment (ECF No. 18). For the reasons that follow, the Court **GRANTS** the Defendant's motion.

## FACTUAL BACKGROUND[1]

The Plaintiff, Jonathan Mitchell, is a 32-year-old resident of Alton, Maine. Def.'s Statement of Material Facts ("**DSMF**") ¶ 1.[2] On the evening of April 9, 2011,

---

[1] The Court constructs this narrative from the facts supported by the record, construed in the light most favorable to the Plaintiff, "drawing all reasonably supported inferences in [the plaintiff's] favor." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 159 (1st Cir. 2008) (alteration in original). Here, the inferences that could be *reasonably* drawn in the Plaintiff's favor are limited by the existence of video evidence captured by cameras on the police cruisers of the two officers involved in the incident. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

[2] Citations to DSMF refer, collectively, to facts proposed by the Defendants, found at ECF No. 25-1, the Plaintiff's responses to those proposed facts, also found at ECF No. 25-1, and the Defendant's replies to the Plaintiff's responses, found at ECF No. 26.

1

Mitchell was staying with two friends at their apartment on Washington Avenue in Portland, Maine. DSMF ¶ 9. During the course of the night, Mitchell drank at a bar and smoked marijuana. DSMF ¶¶ 107, 112.

In the early morning hours of April 10, 2011, Mitchell took one of his host's cars, a black Volkswagen Jetta plastered with bumper stickers, and drove alone to an apartment on Allen Avenue where his wife, Mari Mitchell, was living. DSMF ¶¶ 9-11. Jonathan Mitchell broke into the apartment, woke Mari Mitchell up, and began talking to her about their relationship. DSMF ¶¶ 13-14. At 4:39 a.m., after Jonathan Mitchell left, Mari Mitchell called the police. DSMF ¶¶ 15-16. She told the dispatcher what had happened, gave a description of the Jetta that Jonathan Mitchell was driving, and explained which way he had gone. DSMF ¶ 17; Ex. 8 ("**Dispatch Tape**") at Track 1. Mari Mitchell referred to Jonathan Mitchell as her ex-husband, though they were actually still married. PSMF ¶ 116.

A dispatcher issued a radio bulletin relaying that Mari Mitchell had called in to report that her ex-husband, Jonathan Mitchell, had broken into her house and then fled in a black Volkswagen covered in bumper stickers and turned right off Allen Avenue onto Washington Avenue. Ex. 8 at Track 3; *see also* DSMF ¶ 18. Subsequent dispatches indicated that Jonathan Mitchell's license had been revoked because he was habitual offender, that he was a sexually violent convicted felon, and that Mari Mitchell had described him as being under the influence of alcohol or drugs and possibly unstable. DSMF ¶¶ 41-44.

2

Officer Miller, a four-year veteran of the force, was alone in his patrol car when he heard these dispatches. DSMF ¶ 18; Tr. of July 25, 2013 Dep. of Officer Robert Miller 2-3 (7:22-10:4) ("**Miller Dep.**") (ECF No. 18-2). A camera attached to the front of his cruiser was recording at the time. Def.'s Ex. 9, 11 ("**Car 12 Video**"). As the video from the cruiser cam shows, a vehicle matching Mari Mitchell's description—a black Jetta covered in bumper stickers—passed Officer Miller going the opposite way on Washington Avenue. DSMF ¶ 20; Car 12 Video 00:23. Officer Miller turned his cruiser around and began following. DSMF ¶ 21; Car 12 Video 00:28-32.

The car—driven by Jonathan Mitchell—turned into a residential neighborhood, and then turned right and left at two stop signs that followed, signaling and coming to a complete stop both times. DSMF ¶¶ 22, 24; Car 12 Video 00:46-01:25. At the second stop sign, Officer Miller confirmed that the car matched the description in the radio dispatch. DSMF ¶ 24. Officer Miller turned on his blue lights and siren to signal for Mitchell to pull over. DSMF ¶ 24; Car 12 Video 01:25.

Mitchell did not pull over, though he did continue to signal, stop at stop signs, and drive at a moderate speed for a little over a minute, with Officer Miller following. DSMF ¶ 25; Car 12 Video 01:25-02:32. At the end of this interval, Portland Police Officer David Schertz—who also had a camera attached to his cruiser—joined in the pursuit. DSMF ¶ 31; Tr. of July 25, 2013 Dep. of Officer David Schertz 3 (11:12-15) ("**Schertz Dep.**") (ECF No. 18-3); Def. Exs. 10-11 at 02:12-02:32 ("**Car 9 Video**").

The nature of the chase changed shortly afterwards. Car 9 and 12 Videos 02:33-03:12; *see also* DSMF ¶¶ 26-27. Mitchell turned down another residential side street

3

and then raced ahead, reaching speeds of up to 65 miles an hour. Car 9 and 12 Videos 02:33-03:12; DSMF ¶ 27.

About forty seconds into this phase of his flight, Mitchell turned right onto Fairfield Street; unknown to him, it dead-ended at a guardrail and an embankment a block ahead. DSMF ¶¶ 28-30; Car 9 and 12 Videos 03:13-03:23. Officer Miller turned to follow, with Officer Schertz close behind. DSMF ¶¶ 28, 32; Car 9 and 12 Videos 03:13-03:23. At the dead end, Mitchell veered off the street to the right, up the embankment, coming to a brief stop about three or four feet above street level. DSMF ¶ 33; Car 9 and 12 Videos 03:23-03:25.

The Court recounts the chaotic scene that followed in reference to the second-by-second time-stamps in the two videos from the officers' cruiser cams:

| | |
|---|---|
| 3:22-25 | Officer Miller parks his cruiser on the right side of Fairfield Street, several feet behind and to the left of Mitchell's car. Officer Schertz parks behind Officer Miller. Mitchell begins backing down the embankment, in front and to the right of the parked cruisers. |
| 3:26 | Officer Miller emerges from the driver side of his cruiser. |
| 3:27-28 | The Jetta pulls abruptly forward and to the left two to three feet, before coming to a sudden halt. Officer Miller draws his gun and walks toward the Jetta. |
| 3:29-30 | Officer Miller approaches the front driver side of the Jetta with his gun drawn, yelling loudly for Mitchell to get out of the car. Officer Schertz emerges from the driver side of his cruiser and follows behind Officer Miller on foot. |
| 3:31-32 | Mitchell does not obey Officer Miller's commands. Officer Miller opens the driver-side door of the Jetta with his left hand, keeping his gun trained on Mitchell with his right. |

4

| | |
|---|---|
| 3:33 | The Jetta lurches about a foot forward. Officer Miller continues to hold onto the driver side door with his left hand and keep his gun trained on Mitchell with his right. |
| 3:34 | Officer Schertz follows directly behind Officer Miller and grabs the door of the Jetta with his left hand. |
| 3:35 | Officer Miller reaches into the Jetta to grab Mitchell with his left hand, while keeping his gun trained on Mitchell with his right. |
| 3:36 | Unable to get a grip on Mitchell, Officer Miller lets go and steps back slightly. The car coasts backward about a foot, its driver's side door still open. |
| 3:37 | Officer Miller continues to point his gun at Mitchell and command that he get out of the car. Officer Schertz continues to stand at Officer Miller's rear with his left hand on the Jetta's driver side door. |
| 3:38-40 | The Jetta lurches several feet forward, its wheels turned sharply to the left. Officers Miller and Schertz sidestep to keep pace with the car as it turns and moves forward. Officer Miller continues to hold onto either the driver's seat or car frame with his left hand. |
| 3:41-44 | The Jetta pauses. Officer Miller again tries to grab Mitchell with his left hand while keeping his gun trained on Mitchell with his right. The Jetta again coasts backwards slightly. |
| 3:45-46 | As Officer Miller continues to struggle with Mitchell. Officer Schertz remains behind Officer Miller, near the Jetta's open driver side door. The Jetta's engine begins to rev. |
| 3:47 | The tires screech and Mitchell begins a rapid u-turn to the left. Officers Miller and Schertz are on the inside of the arc the Jetta is making, and Officer Miller is briefly pulled around by the car. |
| 3:48 | As the rear driver-side door of the Jetta passes beside him, Officer Miller fires two shots in Mitchell's direction. |

5

> 3:49-50    The Jetta speeds away. Officer Miller raises his gun again, but does not fire.

Car 9 and 12 Videos 3:29-50; *see also* DSMF ¶¶ 54-59, 63; Plaintiff's Statement of Material Facts ("**PSMF**") ¶¶ 118-33.[3] As Officers Miller and Schertz later re-counted, Mitchell appeared intoxicated and "zoned out" throughout this brief encounter. DSMF ¶¶ 60-61.

One of the bullets fired by Officer Miller lodged into Mitchell's shoulder; the other went through his neck. PSMF ¶ 135. Mitchell remained conscious and returned to his friends' house on Washington Avenue, where he was later apprehended and taken to the hospital.[4] *See* DSMF ¶ 108.

## PROCEDURAL HISTORY

In April of 2013, the Plaintiff filed a four-count complaint (ECF No. 1) before this Court against Officer Miller, the City of Portland, and Portland's acting Chief of Police, James Craig. Count I alleged that Officer Miller violated the Fourth Amendment and Count IV alleged that Officer Miller committed common law assault. Counts II and III stated claims against the City of Portland and Chief Craig. After a case management conference in September of 2013, the Plaintiff voluntarily moved to dismiss Counts II and III. The Defendants moved for summary judgment on the remaining counts.

---

[3] Citations to PSMF refer, collectively, to facts proposed by the Plaintiffs, found at pages 14-19 of ECF No. 24, and to the Defendant's responses to those proposed facts, found at pages 19-22 of ECF No. 24.

[4] A urine test administered at the hospital revealed that Mitchell had amphetamines, benzodiazepines, cannabinoids, and opiates in his system. DSMF ¶ 109. The opiates may be attributable to drugs Mitchell took at his friends' home after the shooting. *See* DSMF ¶ 113.

6

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment only where the movant shows that "there is no genuine dispute as to any material fact" and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). " 'A "genuine" issue is one that could be resolved in favor of either party.' " *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 223 (1st Cir. 2013) (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)). " '[A] "material fact" is one that has the potential of affecting the outcome of the case.' " *Id.* (same).

In deciding a motion for summary judgment, the Court construes the record in the light most favorable to the nonmovant and resolves all reasonable inferences in its favor. *See Jakobiec*, 711 F.3d at 223. However, the inferences that are reasonable to draw are necessarily more limited in cases where the events in question are captured on video and the nonmovant does not challenge the authenticity of the video-recording. *See Scott*, 550 U.S. at 379. In these cases, the Court must "view[ ] the facts in the light depicted by the videotape." *Id.* at 380-81.

At the summary judgment phase, the Court may not weigh the evidence or make credibility determinations. *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014). The motion should be denied if the nonmoving party's evidence is strong enough " 'to support a verdict in her favor.' " *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009) (quoting *Calero-Cerezo*, 355 F.3d at 19).

# DISCUSSION

## I. Count I: The Plaintiff's § 1983 Excessive Force Claim

### A. The Governing Law

#### 1. The Fourth Amendment

The Fourth Amendment provides that the federal government shall not violate "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures . . . ." U.S. Const. amend. IV. The Fourteenth Amendment incorporates this prohibition to the states. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Maryland v. Pringle*, 540 U.S. 366, 369 (2003). For constitutional purposes, a "seizure" occurs whenever a state actor "restrains the liberty of a person" through "physical force or a show of authority." *Estate of Bennett,* 548 F.3d at 167. This includes shootings by police officers. *See id.*

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard,* 134 S.Ct. 2012, 2020 (2014). To determine whether an officer used excessive force in a given case, the court must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (quoting *Tennesee v. Garner*, 471 U.S. 1, 8-9 (1985)).

"This reasonableness inquiry is an objective one; it is not a question of subjective intent." *McGrath v. Tavares*, 757 F.3d 20, 25 (1st Cir. 2014). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent

8

or motivation." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The inquiry is conducted "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Kenney v. Floyd*, 700 F.3d 604, 609 (1st Cir. 2012) (quoting *Graham*, 490 U.S. at 396). It "must account 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 396-97).

Courts applying the excessive force reasonableness test sometimes consider such factors as "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (quoting *Graham*, 490 U.S. at 396). However, the critical judgment must be made in light of the "totality of the circumstances," not through mechanical application of a multi-factor test. *Plumhoff*, 134 S. Ct. at 2019. "[I]n the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383.

### 2. Section 1983 and the Qualified Immunity Doctrine

Section 1983 allows a plaintiff to bring a claim for redress against any person acting under color of state law who subjects him or causes him to be subjected to a deprivation of "rights, privileges, or immunities secured by the Constitution," including the Fourth Amendment's protection against unreasonable seizures. 42 U.S.C. § 1983. However, under the doctrine of qualified immunity, "police officers are protected 'from liability for civil damages'" under § 1983 if "their conduct does not

violate clearly established statutory or constitutional rights.'" *Mlodzinski v. Lewis*, 648 F.3d 24, 32 (1st Cir. 2011).

Courts "employ a two-prong analysis in determining whether a defendant is entitled to qualified immunity," asking "'(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation.'" *Id.* (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)). The second prong itself has two parts:

> First, the court asks "whether 'the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Mosher v. Nelson*, 589 F.3d 488, 493 (2009) (quoting *Maldonado*, 568 F.3d at 269). This inquiry "focuses on the clarity of the law at the time of the alleged civil rights violation." *Maldonado*, 568 F.3d at 269.
> 
> Second, the court asks "whether in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" *Mosher*, 589 F.3d at 493 (quoting *Maldonado*, 568 F.3d at 269). This inquiry "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Maldonado*, 568 F.3d at 269.

*Pollack v. Reg'l Sch. Unit 75*, Docket No. 2:13-cv-00109-NT, 2014 WL 1321118, at *15 (D. Me. Mar. 31, 2014) (spacing modified for clarity).

Where the facts warrant doing so, trial courts have discretion to skip the first prong of the qualified immunity analysis (whether the facts make out a constitutional violation) and instead move immediately to the second prong (whether the right was clearly established). *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). If the court reaches the second prong, "[t]he burden of demonstrating the law was clearly

10

established at the time of the alleged constitutional violation is on the plaintiff." *McGrath*, 757 F.3d at 29.

## B. Application of the Governing Law to the Facts of the Case

Here, as *Pearson* allows, the Court passes over the question of whether the facts make out a triable Fourth Amendment claim and looks first to whether Officer Miller violated a right that was "clearly established" as of April 10, 2011, the date the incident in question occurred.

To answer that question, the Court is aided by *Brosseau v. Haugen*, 543 U.S. 194 (2004), a case in which the Supreme Court granted qualified immunity to a police officer who, like Officer Miller, shot and wounded a suspect fleeing arrest in a car. The incident at issue in *Brosseau* took place on February 21, 1999, so that decision acts as a guidepost as to what was and was not "clearly established" in this area of Fourth Amendment jurisprudence as of that date. *Brosseau*, 543 U.S. at 201. As the First Circuit instructed last month:

> [T]o overcome summary judgment under the second prong of the qualified immunity analysis "in a case where a police officer fired at 'a fleeing driver to protect those whom his flight might endanger,'" a plaintiff would have to show "at a minimum" that the officer's conduct is "materially different from the conduct in *Brosseau*" or that between February 21, 1999, and the date of the alleged constitutional violation "there emerged either controlling authority or a robust consensus of cases of persuasive authority that would alter our analysis of the qualified immunity question."

*McGrath*, 757 F.3d at 30 (quoting *Plumhoff*, 134 S. Ct. at 2023).

The facts in *Brosseau* are similar to the facts in this case. In *Brosseau*, police received a report that Kenneth Haugen had stolen some tools. After following up on the allegation, Officer Brosseau learned that Haugen had a felony warrant out for his

11

arrest. The next day, a report came in that Haugen and the owner of the tools had gotten into a fight at Haugen's mother's house. Officer Brosseau rushed over and Haugen fled on foot. After a thirty to forty-five minute search, Officer Brosseau caught sight of Haugen. Haugen ran to a Jeep parked in front of his mother's house and locked the door. Officer Brosseau demanded Haugen get out of the car. When Haugen refused, Officer Brosseau shattered the Jeep's window with her handgun. After trying to grab Haugen's keys, Officer Brosseau struck Haugen on the head with the butt of the gun. Haugen nonetheless managed to start the Jeep. As the Jeep came to life, Officer Brosseau jumped back and to the left. She then fired one shot through the rear driver's side window, striking Haugen in the back. Haugen maneuvered away without hurting anyone but was apprehended shortly afterwards. Officer Brosseau later testified that she shot Haugen because she was concerned about Haugen's girlfriend and her three-year-old daughter, who Officer Brosseau had earlier instructed to remain in a nearby parked car. *Brosseau*, 543 U.S. at 195-197.

In both the case before this Court and in *Brosseau*: (1) a police officer tried to wrest a fleeing criminal suspect from a car; (2) the suspect refused to exit the car even when threatened with a gun; (3) the suspect attempted to drive away with the officer immediately beside the car and at least one other person in the immediate vicinity; (4) the officer fired while still physically reeling from the suspect's sudden attempt to drive away; (5) the action unfolded so quickly that the officer had no time to react and could reasonably have believed at least one other person in the immediate vicinity was in great danger, even though the suspect ultimately managed to get away

without hurting anyone. The Court sees no principled basis to distinguish the facts of this case from those faced by the Supreme Court in *Brosseau*. If anything, the facts here are more favorable to the defendant-officer. For instance, there was no indication in *Brosseau* that the fleeing suspect was intoxicated or possibly unstable, nor had the suspect in *Brosseau* already engaged police in a high-speed chase.

Because the Plaintiff cannot materially distinguish *Brosseau*, he must point to "controlling authority" or "a robust consensus of cases of persuasive authority" that developed between February 20, 1999, the date the *Brosseau* incident occurred, and the morning of April 10, 2011, which meaningfully alters the analysis. *McGrath*, 757 F.3d at 30. The Plaintiff falls far short of this mark. The majority of the Plaintiff's opposition is concerned with distinguishing the facts at bar from those in cases involving greater danger to police officers or others nearby where qualified immunity was *granted*. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. 4-6 (ECF No. 22). Those holdings represent instances where courts found the law was *not* clearly established; they provide little if any guidance as to where the law *is* clearly established. In fact, the Plaintiff cites just a single case—*Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009)—where a court denied qualified immunity. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. 6 (ECF No. 22).

*Lytle* is a much different case than this one. The facts in *Lytle*, viewed in the light most favorable to the plaintiff, were that the officer fired into the car as many as ten seconds after any immediate danger to the officer had passed, when the car was three or four houses down the block. *Lytle*, 560 F.3d at 414. Additionally, the

officer fired indiscriminately into the car and struck a 15-year-old passenger, not the driver responsible for the chase. The Court's analysis of Officer Mitchell's decision to fire into the Jetta would be a very different one if a similar amount of time had elapsed and an innocent third party had been trapped inside the car. But, even if *Lytle* were more helpful to the Plaintiff, a single out-of-circuit case decided on the basis of a highly fact-specific test does not add up to a robust consensus. Officer Mitchell is therefore entitled to qualified immunity.

## II.     Count IV: The Plaintiff's Maine Tort Law Assault Claim

Where the defendant in a tort case is a governmental employee, the Maine Tort Claims Act provides "absolute immunity" if the defendant was "performing . . . any discretionary function or duty" when the underlying incident occurred, "whether or not the discretion is abused." 14 M.R.S. § 8111(1)(C).[5] This discretionary immunity, though "absolute" under the terms of the statute, is not unlimited in scope. *Richards v. Town of Eliot*, 780 A.2d 281, 293 (Me. 2001). If a police officer "uses excessive force in executing an arrest, such action is beyond the scope of the officer's discretion" and § 8111(1)(C) offers no protection against tort liability. *Id.*

According to the Defendant, the standard for determining whether a police officer's actions exceeded his discretionary authority under the Maine Tort Claims Act is the same as the standard for determining whether the officer has violated

---

[5]     The Maine Tort Claims Act also offers "absolute immunity" to governmental employees for "[a]ny intentional act or omission within the course and scope of employment; provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith." 14 M.R.S. § 8111(1)(E). The Defendant cites to this provision, Def.'s Mot. for Summ. J. 17 (ECF No. 18), but neither party explains how it operates on the fact of this case.

14

clearly established law for purposes of qualified immunity. Def.'s Mot. for Summ. J. 17 (ECF No. 18). The Plaintiff does not contest or even address the issue. The Court therefore grants the Defendant summary judgment as to Count IV as well.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant Robert Miller's motion for summary judgment on Counts I and IV, the only remaining claims against him.

SO ORDERED.

/s/ Nancy Torresen<br>United States District Judge

Dated this 26th day of September, 2014.